## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SARAH JACKSON** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **LEHIGH COUNTY; JANINE** | : | **Case No. 5:23-cv-1877** |
| **DONATE, Director of** | : | |
| **Corrections; KYLE RUSSELL,** | : | |
| **Warden; ROBERT MCFADDEN,** | : | |
| **Deputy Warden for Security;** | : | |
| **STEVEN MILLER, Deputy Warden** | : | |
| **for Treatment; PRIMECARE** | : | |
| **MEDICAL, INC.; AMANDA BENNER,** | : | **JURY TRIAL DEMANDED** |
| **Medical Director; DR. ALEXANDER** | : | |
| **THOMAS; HEATHER O'DONNELL;** | : | |
| **KIMBERLY SHEPPARD; JONATHAN** | : | |
| **BARLOW** | : | |
| | : | |
| | : | |
| **Defendants** | : | |
| | : | |
| | : | |

### JURISDICTION AND VENUE

1.     This case is brought pursuant to 42 U.S.C.§ 1983, the Americans with Disabilities

Act, 42 U.S.C. §§ 12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a),

seeking compensatory and punitive damages.

2.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4).

3.     This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in Lehigh County, in the Eastern District of Pennsylvania.

**PARTIES**

4.     Plaintiff Sarah Jackson, formerly known as Sarah Montgomery, is a woman residing in Allentown, Pennsylvania who at all times relevant was incarcerated at Lehigh County Jail ("LCJ").

5.     Defendant Janine Donate was the Director of Corrections for Lehigh County during all times relevant and as such was responsible for overseeing all operations and policies implemented at LCJ.

6.     Defendant Lehigh County is a county government organized and existing under the laws of the Commonwealth of Pennsylvania. Lehigh County is in possession and control of LCJ.

7.     Defendant PrimeCare Medical, Inc. ("PrimeCare") is a Pennsylvania Corporation with principal place of business and headquarters in Pennsylvania. At all times relevant PrimeCare was responsible for providing comprehensive mental and physical healthcare for inmates throughout Lehigh County including in LCJ.

8.     Defendant Kyle Russell was the warden of LCJ during all times relevant and as such was responsible for implementing all policies and training at LCJ.

9.     Defendant Robert McFadden was the Deputy Warden for Security at Lehigh County Jail during all times relevant and as such was responsible for the training of correctional officers ("CO's") at LCJ.

10.     Defendant Steven Miller was the Deputy Warden for Treatment at LCJ during all times relevant and as such was responsible for responding to prisoner grievances and overseeing all programming and social services at LCJ.

11.     Defendant Amanda Benner at all times relevant was the medical director responsible for implementing all medical care at LCJ.

12.     Defendant Alexander Thomas, M.D. is a board certified psychiatrist and at all times relevant was contracted or employed to provide psychiatric care to inmates at Lehigh County Jail.

13.     Defendant Heather O'Donnell, L.P.C. was, at all times relevant, a Licensed Professional Counselor at Lehigh County Jail.

14.     Defendant Kimberly Sheppard, L.P.C. was, at all times relevant, a Licensed Professional Counselor at Lehigh County Jail.

15.     Defendant Jonathan Barlow, L.P.C. was, at all times relevant, a Licensed Professional Counselor at Lehigh County Jail.

## STATEMENT OF FACTS

### Background

16.     On May 17, 2021, Ms. Jackson, formerly Sarah Montgomery, was in the midst of a psychotic episode and sought treatment in the emergency room of Lehigh Valley Hospital – Muhlenberg.

17.     After waiting hours for treatment and evaluation Ms. Jackson became disruptive by yelling and was restrained by a security guard.

18.     Ms. Jackson struggled with the guard and, while still in the midst of her psychotic episode, bit the guard on the arm and was charged with aggravated assault.

19.     Lehigh Valley Hospital made the decision to not involuntarily commit Ms. Jackson, and instead released her to LCJ where Lehigh Valley Hospital doctors falsely believed she would "receive treatment".

20.     In reality, Ms. Jackson was removed from a hospital with a world-class psychiatric facility, staff, and resources, capable of treating her mental condition and placed in LCJ, a facility with systemically inadequate staffing, resources, and procedures where she received effectively no treatment for her serious medical condition and psychiatric disability.

21.     Ms. Jackson has been diagnosed with a serious medical condition, specifically, Ms. Jackson has been diagnosed with Bipolar Disorder as defined in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition.

22.     Ms. Jackson's serious medical condition is a driving force for her psychiatric disability.

23.     Ms. Jackson receives Supplemental Security Income as a condition of her psychiatric disability.

24.     Ms. Jackson's mental condition makes her particularly vulnerable to prolonged isolation.

25.     During the first four months of her approximately eight months of incarceration, Ms. Jackson was presumptively innocent and remained at LCJ for the sole reason that she could not afford to post bail.

26.     Ms. Jackson eventually pleaded no contest to a reduced charge of simple assault, for which a sentence of probation is a typical consequence.

27.     LCJ has a history of failing to diagnose or provide mental health treatment to the significant number of inmates in need of such treatment.

28.     LCJ has a pattern of providing mental health treatment that is unconscionably inadequate, grossly below accepted medical standards, and amounts to no treatment at all,

29.     For inmates with mental health conditions the lack of care at LCJ often results in the further deterioration of their mental health condition.

30.     Instead of adequate treatment, LCJ has implemented policies, customs, and a culture furthered through a lack of training for both medical and non-medical staff, that punishes inmates with severe mental illnesses for seeking treatment or reasonable accommodations for their mental illness, or displaying manifestations of their mental illness.

31.     It is those policies, customs, and culture that led to the complete lack of adequate treatment Ms. Jackson received and contributed to Ms. Jackson's pain and suffering.

32.     A widespread consensus exists among scientific, legal, judicial, medical, and corrections experts that the use of solitary confinement is destructive to a person's mental health and should be prohibited or limited, especially for inmates with psychiatric disabilities.

33.     Defendant PrimeCare was solely responsible for providing mental and physical medical treatment at Lehigh County Jail during Ms. Jackson's incarceration.

34.     Defendant Lehigh County's contract with Defendant PrimeCare contains no enforceable standards regarding the provision of medical care within the jail.

35.     Ms. Jackson's serious mental health condition was exacerbated by the grossly inadequate treatment she received while incarcerated in LCJ.

**Ms. Jackson was punished for her psychiatric disability and mental health condition by being placed in extreme isolation, equivalent or more harsh than the conditions of solitary confinement.**

36.     From the moment Ms. Jackson entered LCJ on or about May 18, 2021, Ms. Jackson was isolated from the general population of the jail, prevented from accessing

programming and services within the jail, including religious worship, Bible study, and academic

or vocational classes. Instead, Ms. Jackson was kept in the isolated conditions of solitary

confinement under the classification of "Psychological Observation".

37.     Placing Ms. Jackson in isolation for an extended period of time caused her mental

health to deteriorate.

38.     Contrary to what the name of the classification suggests, Psychological

Observation at LCJ does not include adequate medical care, therapy, or other necessary care for

the treatment of a severe mental health condition.

39.     In reality, and by design,  LCJ's Psychological Observation, created by,

maintained, and administered by Defendants Benner and PrimeCare, is equivalent or more harsh

and punitive in all material respects to the isolation and conditions of solitary confinement at

LCJ sometimes known as "disciplinary segregation".[1]

40.     Examples of how psychological observation is more punitive than solitary

confinement include Ms. Jackson having less time out of her cell, being denied heat and clothing,

such as socks, and being denied access to systematically provided reading materials while under

a psychological observation status unlike inmates under a disciplinary segregation status.

41.     As a result of the lack of heat and socks Ms. Jackson's feet became cracked and

began to bleed.

42.     Ms. Jackson's complaints and appeals to PrimeCare and LCJ staff including

Defendants Benner, Thomas, O'Donnell, Sheppard, and LCJ staff about her feet were ignored by

all.

---

[1] The isolation of "Psychological Observation", "Disciplinary Segregation", and what is commonly known as
solitary confinement are all materially equivalent and are used interchangeably below.

43.     When Ms. Jackson opened her mattress and used the inner lining to warm her feet, Ms. Jackson was punished by removal of her mattress and further and prolonged isolation for violating prison rules.

44.     Ms. Jackson's medical records and jail records indicate that Ms. Jackson's complaints about her isolation and lack of medical treatment were interpreted as a symptom of her mental illness.

45.     Ms. Jackson spent the entirety of her incarceration under the isolated conditions of solitary confinement whether in psychological observation or disciplinary segregation.

46.     During her isolation Ms. Jackson never received adequate medical care for her severe mental illness.

47.     Such austere isolation led to Ms. Jackson's suffering depression, hopelessness, and general deterioration of her mental health.

**Ms. Jackson was given grossly inadequate medical care equivalent to not receiving any treatment at all, which served to worsen her serious medical condition and psychiatric disability.**

48.     As a board certified psychiatrist Defendant Thomas was qualified to diagnose and treat Ms. Jackson's medical condition, including by prescribing medication.

49.     As Licensed Professional Counselors Defendants O'Donnell, Sheppard, and Barlow diagnosed Ms. Jackson's medical condition, and are qualified to treat her medical condition.

50.     Ms. Jackson did not receive an efficient and effective in-depth assessment of her mental health condition upon arrival at LCJ. Instead, she was subject to an inadequate cursory intake process through which LCJ and Defendant PrimeCare staff did not obtain the information

necessary for proper diagnostic evaluation and a corresponding adequate comprehensive treatment plan for Ms. Jackson.

51.     Together, PrimeCare's staff and contractors, including Defendants O'Donnell, Sheppard, Barlow, and Thomas, diagnosed Ms. Jackson with Bipolar Disorder as defined in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. based only on Ms. Jackson's self-reporting of her mental health history and casual observation of Ms. Jackson.

52.     Ms. Jackson's medical records indicate PrimeCare staff and contractors did not create or implement any treatment plan to alleviate or manage Ms. Jackson's medical condition beyond the prescription of medication.

53.     Despite being medically necessary, Ms. Jackson was not provided any treatment modalities such as therapy, group therapy, anger management, or other treatment to address her mental condition, history of trauma, trauma caused by the torturous effects of her incarceration in LCJ, or the obvious and medically predictable deterioration of her mental and emotional state.

54.     Such medically necessary treatment was not provided in-person or through telemedicine.

55.     Ms. Jackson's medical records are devoid of any discussions about the appropriateness or treatment efficacy of continuing to isolate her in solitary confinement.

56.     Ms. Jackson was given medication and merely briefly spoken to or observed for approximately one to five minutes at a time, every few days, by Defendant's O'Donnell, Sheppard, or Barlow.

57.     All of the times Defendant's O'Donnell, Sheppard, and Barlow spoke to Ms. Jackson the brief interactions were within hearing of non-mental-health professionals, including CO's and other inmates which violated Ms. Jackson's right to privacy, rightly would make

anyone uncomfortable to disclose private and protected health history and information, and made valuable diagnostic and treatment information impossible to obtain.

58.     Ms. Jackson's medical records lack specific details about how her condition developed during her incarceration at LCJ because such information was not obtained. Her records only discuss the aforementioned brief cell-side encounters or reports of Defendants O'Donnell, Sheppard, or Barlow briefly observing but not speaking with Ms. Jackson.

59.     As a result of this lack of planning and adequate treatment, Defendants were incapable of assessing the impact Ms. Jackson's prescribed medication was having on her or how her condition was developing — a basic tenant of adequate psychiatric care.

60.     As a result of the grossly inadequate mental health treatment provided by Defendants Thomas, O'Donnell, Sheppard, Barlow, and Benner, Ms. Jackson's mental health deteriorated, leaving her vulnerable to future mental health crises and thus increasing the likelihood of her mental health being further harmed in the future.

**Ms. Jackson was further punished, institutionalized, and isolated for manifestations of her psychiatric disability and serious mental health condition.**

61.     The LCJ CO's and other correctional staff's treatment of Ms. Jackson compounded Ms. Jackson's suffering.

62.     CO's at LCJ receive minimal and inadequate training, or no training at all, in how to identify manifestations of mental illness in inmates, and how to appropriately work with inmates with psychiatric disabilities.

63.     LCJ has implemented policies, customs, and a culture furthered through a lack of training for both medical and non-medical staff, that punishes inmates with severe mental illnesses for seeking treatment or reasonable accommodations for their mental illness, or displaying manifestations of their mental illness.

64.     Instead, the lack of training, CO's and all medical and jail staff should have been provided with mandatory and frequent training and refresher training that meets industry standards and sound medical advice for recognizing when someone may be acting in accordance with a psychiatric disability and safely addressing and de-escalating situations where someone is acting in accordance with a psychiatric disability that violates jail policy.

65.     As a direct result of their inadequate training, CO's at LCJ were not prepared to handle and respond appropriately when Ms. Jackson exhibited manifestations of her mental condition.

66.     As was the case with her attempts to warm her feet after her appeals were ignored, during her incarceration Ms. Jackson was continually punished and further institutionalized for manifestations of her mental illness that allegedly violated LCJ's rules for inmates.

67.     Each time Ms. Jackson was perceived to have violated a prison rule, as is common at LCJ, CO's responded as they are trained to do — with punitive measures that serve to target, punish, and discriminate against Ms. Jackson for exhibiting manifestations of her psychiatric disability and serious mental health condition.

68.     As any competent medical professional or correctional staff with appropriate training could have predicted, without adequate mental health treatment, and due to her continued punishment for manifestations of her psychiatric disability, Ms. Jackson was harmed mentally and emotionally due to the atypical and significant hardship the conditions of her confinement caused.

69.     Ms. Jackson was punished and discriminated against by CO's who, following custom and policy of LCJ, routinely placed Ms. Jackson in disciplinary segregation for manifestations of her severe mental illness.

70.     Despite effective contact with mental health professionals being absolutely essential to the treatment LCJ was obligated to provide Ms. Jackson, Ms. Jackson received even less contact with mental health professionals when she was moved from Psychological Observation and further institutionalized in Disciplinary Segregation.

71.     The inadequate treatment Ms. Jackson received while incarcerated fell grossly below any accepted medical standard of care and amounted to no treatment at all.

**Ms. Jackson was denied the ability to challenge the extreme isolation and punishment she faced due to manifestations of her psychiatric disability and serious mental health condition.**

72.     During her time as a pretrial detainee, Ms. Jackson was constitutionally protected under the Fourteenth Amendment from punishment without due process during her detention.

73.     After her plea Ms. Jackson was constitutionally protected under the Eighth Amendment from "cruel and unusual punishment".

74.     Ms. Jackson was punished by being placed in the extreme isolation equivalent or more harsh than the conditions of solitary confinement for the entirety of her incarceration, subjected to the horrific mental health consequences that isolation brings, and not provided adequate medical treatment.

75.     Despite the fact that she was punished continually as described above, throughout her time in LCJ  Ms. Jackson was never provided an opportunity to challenge her placement in isolation or the conditions of her punishment and further isolation.

76.     Appropriate due process procedures would have brought to light that Ms. Jackson was being held in extreme isolation and not receiving adequate mental health treatment.

77.     Appropriate due process procedures would have brought to light that the movement of Ms. Jackson from psychological observation to disciplinary segregation led to even

less contact with mental health professionals and continued failure to provide Ms. Jackson with adequate treatment.

78.     Appropriate due process procedures would have revealed the inadequate treatment Ms. Jackson received while incarcerated fell grossly below any accepted medical standard of care, and amounted to no treatment at all.

**PrimeCare Medical Inc. and their employees and contractors did not intervene to prevent Ms. Jackson being punished for exhibiting manifestations of her psychiatric disability and serious mental health condition and did not transfer Ms. Jackson to a facility that could provide adequate treatment.**

79.     Multiple administrative, correctional, and medical staff at LCJ receive and review reports of any placement of an inmate in solitary confinement, often referred to at LCJ as disciplinary segregation. Those staff include Defendants Donate, Miller, McFadden, Russell, and Benner.

80.     Defendants Donate, McFadden, Miller, Russell, and Benner were all made aware of Ms. Jackson's placement in solitary confinement for her alleged behavior infractions because written reports were routinely prepared and reviewed by all of these Defendants.

81.     Defendants Donate, McFadden, Miller, Russell, and Benner were aware of Ms. Jackson's  being incarcerated in solitary confinement and approved, or at least did not object.

82.     Defendants Donate, McFadden, Miller, Russell, and Benner made a joint decision to continue incarcerating Ms. Jackson in solitary confinement, notwithstanding her serious medical condition and the harm her incarceration was having on her condition.

83.     The negative and horrific consequences of Ms. Jackson's confinement would have been clear, or should have been clear,  to licensed medical professionals such as Defendant's Thomas, O'Donnell, Sheppard,  Barlow, and Benner.

84.     Despite the obvious negative impact her confinement was having on her mental health, and the fact that she was being punished due to her psychiatric disability, Defendants Thomas, O'Donnell, Sheppard, Barlow and Benner did not at any point recommend that Ms. Jackson be transferred to a facility capable of providing adequate treatment for her condition.

85.     As a testament to her extraordinary personal faith, strength, intelligence, and perseverance, Ms. Jackson made numerous pleas to LCJ and PrimeCare staff to receive constitutionally required treatment.

86.     With absolutely no formal legal training or legal counsel Ms. Jackson made reference in her written pleas and interactions with all Defendants to the six claims she brings forth today.

87.     Specifically, Ms. Jackson noted the conditions of her confinement were "cruel and unusual", she requested adequate treatment for her mental condition or transfer to a facility that could provide such treatment, and she requested "reasonable accommodation" for her disability under the Americans With Disabilities Act and Rehabilitation Act.

88.     Ms. Jackson's pleas were denied by LCJ's and PrimeCare's staffs, and Ms. Jackson was explicitly told by LCJ and PrimeCare staff that such accommodations and treatment would violate jail policy.

89.     Notably, PrimeCare and LCJ are in exclusive possession of many of the documents, manuals, and policies that would provide further evidence of Ms. Jackson's claims and Defendants' wrongdoing.

90.     Ms. Jackson's counsel has been unable to obtain such records through public records requests, as well as requests made through public forums and emails and phone calls.

91.    PrimeCare and LCJ have not responded openly to right-to-know requests, and PrimeCare has called certain policies and procedures "proprietary".

## Count I

**Violation of Eighth and Fourteenth Amendment Rights Under 42 U.S.C. § 1983 Based Upon Failure to Treat Ms. Jackson's Serious Mental Health Needs, for Compensatory and Punitive Damages against All Defendants**

92.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1-91 of this Complaint as though set forth fully herein.

93.    Plaintiff has serious medical needs in that she has been diagnosed with Bipolar Disorder as defined in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. Other diagnoses may apply, but the Defendants' lack of adequate screening, diagnosis, and treatment denied Ms. Jackson an effective specific assessment of her total mental health status.

94.    Defendants were aware of Plaintiff's serious medical condition.

95.    Defendants diagnosed Plaintiff with Bipolar Disorder as defined in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition.

96.    Defendants were aware that Plaintiff's serious medical condition can be alleviated and managed with appropriate and adequate care and treatment.

97.    Plaintiff was effectively denied access to adequate mental health care as a result of Defendants' gross deficiencies and inability or unwillingness to treat Plaintiff's serious medical condition.

98.    Defendants acted with objective unreasonableness or deliberate indifference to Plaintiff's serious mental health conditions in that they:

a. Did not use a reliable system to diagnose or screen for Plaintiff's mental health conditions, but instead relied on Plaintiff's self-reporting and casual observation;

b. Did not provide a comprehensive evaluation of Plaintiff after Plaintiff was identified as in need of medical treatment;

c. Did not prepare or utilize a treatment plan;

d. Did not respond to Plaintiff's request for mental health treatment;

e. Did not provide any medically-indicated counseling or therapy;

f. Did not provide sufficient staffing to ensure appropriate mental health treatment;

g. Permitted the use of punitive measures such as placing Plaintiff in solitary confinement as punishment for behaviors that are expected from and consistent with Plaintiff's mental health condition;

h. Did not interrupt punitive measures that were consequences of Plaintiff's mental health condition when appropriate;

i. Implemented a policy and procedure that did not allow mental health staff to interrupt use of punitive measures when appropriate.

99. Defendant's acts and omissions as described above proximately caused the deprivation of Plaintiff's rights, exacerbated her serious medical condition, and caused her to suffer physical and psychological harm and extreme mental anguish.

## **Count II**

**Violation of Eighth and Fourteenth and Amendment Rights Under 42 U.S.C. §1983 Based Upon Policy, Custom, and Failure To Train Or Supervise, for Damages against Defendants Lehigh County, Donate, Russell, McFadden, Miller, PrimeCare, and Benner.**

100. Plaintiff incorporates by reference the allegations set forth in paragraphs 1-91 of this Complaint as though set forth fully herein.

101.    Defendants fail to adequately train, by use of mandatory and frequent training and refresher training, and supervise individuals in their employ or under their control and supervision to meet industry standards and sound medical advice for recognizing when someone may be acting in accordance with a psychiatric disability and safely addressing and de-escalating situations where someone is acting in accordance with a psychiatric disability that violates jail policy.

102.    As a proximate result of Defendants' failure to train and supervise, Plaintiff has suffered deprivation of rights secured under the Fourteenth and Eighth Amendments of the Constitution and laws of the United States.

103.    Such deprivations caused irreparable injury, including physical, psychological, and emotional injury.

### Count III

**Violation of Plaintiff's Rights Under The Due Process Clause Of The Fourteenth Amendment Under 42 U.S.C. § 1983, for Compensatory and Punitive Damages against Defendants Lehigh County, Donate, Russell, McFadden and Miller.**

104.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1-91 of this Complaint as though set forth fully herein.

105.    Plaintiff has serious medical needs in that she has been diagnosed with Bipolar Disorder as defined in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. Other diagnoses may apply, but the Defendants' lack of adequate screening, diagnosis, and treatment denied Ms. Jackson an effective specific assessment of her total mental health status.

106.    Defendants were aware of Plaintiff's serious medical condition.

107.    Defendants diagnosed Plaintiff with Bipolar Disorder as defined in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition.

108.    Plaintiff's medical condition places her at heightened risk of decompensation, emotional pain and suffering, elevated anxiety, panic attacks, and depression if she is placed in solitary confinement.

109.    The hardship of prolonged isolation makes Plaintiff's serious medical condition significantly worse, and amounts to a punishment beyond the expected conditions of confinement.

110.    Plaintiff was placed at substantial risk of serious harm due to Defendants' policies and practices of solitary confinement labeled "psychological observation" without adequate medical treatment for psychiatric disabilities.

111.    Plaintiff was placed at substantial risk of serious harm due to Defendant's disciplinary policies and practices that did protect people with serious mental illness like her from the extended isolation in solitary confinement.

112.    The severity of Plaintiff's mental health and the consequences of her confinement would have been obvious to competent medical professionals.

113.    Solitary confinement deprived Plaintiff of her basic human needs for mental and physical health, social interaction, exercise, and environmental stimulation.

## Count IV

**Violation of Procedural Due Process Under The Due Process Clause Of The Fourteenth Amendment Under 42 U.S.C. § 1983, for Compensatory and Punitive Damages against Defendants Lehigh County, Donate, Russell, McFadden and Miller.**

114.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1-91 of this Complaint as though set forth fully herein.

115.  Defendants have violated Plaintiff's right to procedural due process in that they:

   a.  Imposed punishment via placement in the extreme isolation equivalent or more harsh than solitary confinement under the guise of "psychological observation" without first, or in fact ever, holding a hearing;

   b.  Did not permit Plaintiff to call witnesses or present evidence when determining whether she should be placed or remain in extreme isolation;

   c.  Did not provide Plaintiff with a written copy of the rules, regulations, and expected behaviors of inmates for at least the first two months of her confinement;

   d.  Did not provide Plaintiff with a written copy of the rule violation ahead of any hearing;

   e.  Did not permit Plaintiff to call witnesses or present evidence when determining whether she was guilty of the charge or not;

   f.  Did not provide Plaintiff with copies of a written determination as to the disposition of the charges against her.

## Count V

**Title II Of The Americans With Disabilities Act, for Compensatory Damages against Lehigh County.**

116.   Plaintiff incorporates by reference the allegations set forth in paragraphs 1-91 of this Complaint as though set forth fully herein.

117.  Lehigh County is in possession and control of LCJ.

118.  LCJ is a public entity as defined in 42 U.S.C. § 12131.

119.  Plaintiff meets the essential eligibility requirements for the receipt of services or the participation in programs or activities at LCJ during her incarceration.

120.    Defendants have discriminated against Plaintiff on the basis of her disability in the following ways:

    a.   Failing to provide Plaintiff with proper treatment for her serious mental condition despite knowledge of her condition;

    b.   Failing to reasonably accommodate Plaintiff's disability by refusing to transfer Plaintiff to a facility capable of providing adequate care after being unwilling or incapable to provide such care themselves;

    c.   Failing to reasonably accommodate Plaintiff's disability and instead discriminating against her in ways that increase the severity of her illness by depriving her of clothes, heat, jail programming to include Bible studies, and sanitary surroundings, as a result of manifestations of her mental illness;

    d.   Failing to reasonably accommodate Plaintiffs' disability and instead discriminating against her in ways that increase the severity of her illness by such methods as placing her in solitary confinement or other equally isolated environments as punishment for manifestations of her mental illness.

121.    In acting in the manner alleged above, Defendants have unlawfully discriminated against Plaintiff in violation of the ADA.

122.    As a proximate result of Defendants' wrongful conduct, Plaintiff has suffered irreparable harm and injury, including physical, psychological, and emotional injury.

## Count VI

**Violation of Section 504 Of The Rehabilitation Act, for Declaratory and Injunctive Relief against Lehigh County.**

123.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1-91 of this Complaint as though set forth fully herein.

124.    Lehigh County is in possession and control of LCJ.

125.    LCJ receives public money and is subject to Section 504 of the Rehabilitation Act.

126.    Plaintiff meets the essential eligibility requirements for the receipt of services or the participation in programs or activities at LCJ during her incarceration.

127.    Defendants discriminated against Plaintiff on the basis of her disability by:

   a.  Failing to provide Plaintiff with proper treatment for her serious mental condition, despite possessing knowledge of her condition;

   b.  Failing to reasonably accommodate Plaintiff's disability by refusing to transfer Plaintiff to a facility capable of providing adequate care after being unwilling or incapable to provide such care themselves;

   c.  Failing to reasonably accommodate Plaintiff's disability and instead discriminating against her in ways that increase the severity of her illness by depriving her of clothes, heat, jail programming to include Bible studies, and sanitary surroundings as a result of manifestations of her mental illness;

   d.  Failing to reasonably accommodate Plaintiffs' disability and instead discriminating against her in ways that increase the severity of her illness by such methods as placing her in solitary confinement or other equally isolated environments as punishment for manifestations of her mental illness.

128.    In acting in the manner alleged above, Defendants have unlawfully discriminated against Plaintiff in violation of Section 504 of the Rehabilitation Act.

129.    As a proximate result of Defendants' wrongful conduct, Plaintiff has suffered irreparable harm and injury, including physical, psychological, and emotional injury.

## JURY TRIAL DEMANDED

Plaintiff requests a trial by jury with respect to all matters and issues properly triable by a jury.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that this Court:

a. Award Plaintiff compensatory damages for the violations of her Constitutional and legal rights.

b. Award Plaintiff punitive damages for the violations of her Constitutional and legal rights.

c. Award Plaintiff reasonable attorney's fees pursuant to 42 U.S.C. § 12205.

d. Award any such further relief as this Court may deem just.

Respectfully submitted,

May 17, 2023

_s/Ettore J. Angelo_
Attorney for Plaintiff
PA Bar ID: 44050
angelolaw@comcast.net
Phone: (215) 280-0563
1534 West Broad Street
Quakertown, PA 18951